BERSTON v. CITY OF FLINT.

1. DRAINS—MUNICIPAL CORPORATIONS—FLINT CHARTER—SEWER—TRUNK LINE INTERCEPTING SEWER.

Within the meaning of the charter of the city of Flint, as amended, a storm drain, including a district of some 200 acres, in which from a fifth to a sixth of the population of the city lived, and which was constructed deep

enough to connect with lateral sewers and branches in the district, intended by the municipal authorities to form part of a system and provide an outlet for surface water which tended to accumulate in the area drained, was a "trunk line intercepting sewer," defined in the charter as a sewer of which the principal object should be the general benefit of the health of the city, or which should be constructed to relieve the river of sewage, etc.

2. · MUNICIPAL CORPORATIONS—DRAINS.

Under provisions of the city charter of Flint granting to the common council the power to determine what part of the expense of constructing trunk line sewers should be borne by the municipality, and limiting the amount to such part as primarily benefits the health of the entire city, a determination that the city should pay for 25 per cent. of the cost of a storm drain or sewer, in the absence of evidence of fraud or good faith, was conclusive.

3. TAXATION—SPECIAL ASSESSMENTS—RIGHT OF WAY—CORPORA-TIONS—COMPROMISE.

In preparing to construct a sewer and to levy a special assessment to pay for the same, the common council of the city of Flint acted without legal authority, where, instead of proceeding in the regular way to obtain a right of way for the sewer, the city made a special arrangement with one of the manufacturing corporations within the district to allow a stated sum for the right of way through its lands and to limit the assessment of the corporation to $500, thereby paying more than the easement was worth and adding to the burden of the others assessed.

Appeal from Genesee; Smith, J., presiding. Submitted April 28, 1913. (Docket No. 46.) Decided July 9, 1913.

Bill by Neil J. Berston and another against the city of Flint for an injunction. From a decree for complainants, defendant appeals. Affirmed.

Black & Roberts, for complainants.

Homer J. McBride, for defendant.

BROOKE, J. Complainants seek in this action to enjoin the defendant city from confirming an assessment roll, and from entering into a contract for the construction of a certain sewer. The sewer in question is known as "Parkland stormwater sewer." It commences at the intersection of Leith street and Industrial avenue, running thence easterly to State street, thence on State street to Flint river. As designed, it is 3,185 feet long, 54 inches in diameter, and the estimated cost thereof is $25,386. At the present westerly terminus of the proposed sewer, at the intersection of Leith street and Industrial avenue, the ground is much lower than it is north and west of that point, in which directions complainants' property is situated. There seems to have been a natural waterway running from Industrial avenue in an easterly direction to the river, which in recent years has been obstructed by improvements made by the General Motors Company or by its predecessor in title. This natural way having been filled with earth, the General Motors Company placed a 30-inch sewer under Industrial avenue and across its property to take care of the surface water from the north and west which had formerly reached the river through the natural way. In times of heavy precipitation this 30-inch sewer was found to be inadequate, and a considerable area in the vicinity of Leith and Industrial avenues was flooded. The immediate purpose of the contemplated work is to take care of the surface water accumulating at this point. The ultimate purpose of the city, as disclosed by its consulting engineer, is to extend this sewer by building branches north and south on Industrial avenue and thence west, thus making of the section now contemplated a main or trunk line sewer into which would be delivered the surface waters collected in the branches and laterals ultimately to be constructed

when the plan is fully carried out. The area to be thus served is about 200 acres in extent.

The defendant, assuming to act under its charter powers, determined that 25 per cent. of the cost of construction should be borne by the city at large and 75 per cent. by those owning property in a duly defined special assessment district. The sewer is designed as a stormwater sewer only; the purpose of the city being to construct a separate drainage system for sanitary sewage.

Section 1 of Act No. 554 of the Local Acts of 1907, being amendatory of "An act to incorporate the city of Flint," provides:

"The common council shall have power to cause the expense of making, paving, grading and opening of streets, lanes, alleys, sidewalks, parks, public grounds, sewers and other local improvements to be assessed in whole or in part against the owners or occupants of property to be especially benefited thereby, or by general tax in whole or in part, as it shall deem just and proper: *Provided,* that hereafter, when any trunk line intercepting sewer or sewers shall be constructed, the cost and expense of such part thereof as shall be designed primarily for the benefit of the health of the whole city, shall be assessed against the city at large; trunk line intercepting sewers shall be taken and understood to mean any sewer or sewers, the principal object and purpose of which shall be a general benefit to the health of the city, or which shall be constructed primarily for the purpose of protecting and preserving the salubrity of the waters of the Flint river, and particularly any sewer or sewers which shall parallel the river for the purpose of receiving the sewage of other sewers theretofore or thereafter constructed which would otherwise be emptied into and pollute the water of said river."

Section 2 (Act No. 346, Local Acts 1901, chap. 20)' provides:

"Whenever the common council shall determine that the whole or any part of the expenses of any

public improvement shall be defrayed by an assessment against the owners or occupants of houses or lands to be especially benefited thereby, they shall ascertain as they may think proper the estimated or actual expense of such improvement made or to be made, and shall declare by resolution, to be entered in their records, whether the whole, or what portion thereof, shall be assessed against such owners or occupants, specifying the sum to be assessed and the portion of the city which they deem will be specially benefited by such improvement; and the costs and expenses of making the plans, estimates and assessments incidental thereto shall be included in the estimated expenses of such improvement."

The opinion of the learned circuit judge was, in part, as follows:

"I take up first the question of necessity. As the situation now exists I find there is a necessity for additional stormwater facilities in that part of the city. The public health demands it. A witness gave the number of employees that work in the various factories in that part of the city at 5,000. He was not accurate. Counsel stated in open court the number to be from 5,000 to 8,000. All this great number of employees work in the factories located in that part of the city. It is one-fifth or one-sixth of the entire population of the city of Flint. Some of them live in the district involved in the proposed system of sewers. Many of them are living, scattered about at night in all parts of the city. It is in my opinion such a large and important part of the city of Flint that it may be fairly and accurately said to be for the general benefit of the health of the whole city. The next question considered is this: Is it a trunk line intercepting sewer within the meaning of section 1 of Act No. 554, Local Acts of 1907? I quote the definition given by Prof. Hoad of Ann Arbor, the principal witness on behalf of the city:

"'Q. Now, what would be a trunk line sewer, Professor?

"'A. A "trunk line sewer," the term is a little indefinite, but engineers understand it is a main sewer which furnishes a common outlet for a number of district mains.

"'Q. What would you say about an "intercepting sewer;" is that a technical term?

" '*A.* Yes, sir.

" '*Q.* What is that, Professor?

" '*A.* An "intercepting sewer" would be one that has a more definite meaning. It is one that traverses a water front at an elevation somewhat lower than the outlets of numerous sewers coming down and discharging water, and which intercepts the flow of sewage from these various sewers and carried it clear down perhaps below the city, at least to some lower point.

" '*Q.* That is the civil engineer's definition of it, is it?

" '*A.* Yes, sir.'

"I believe it to be a trunk line intercepting sewer within the meaning of this act, and that the injunction must issue as asked because it is a charge under this statute against the city at large. I also believe the extension westerly of this particular portion involved in this case, if the system is extended, will be a trunk line intercepting sewer also. It will receive the water from a considerable number of lateral district sewers."

We find no difficulty in agreeing with him that the sewer in question, so far as presently designed, is a "trunk line intercepting sewer" within the meaning of the act. We are also of opinion that it may fairly be said that the sewer is (in some measure, perhaps largely) for the general benefit of the health of the whole city. But from these facts it does not in our opinion necessarily follow that the city is precluded from assessing any portion of the cost of the improvement upon a district specially benefited thereby. The language of the charter is peculiar.

The entire cost and expense of constructing sewers of this class is not to be borne absolutely by the city, but only the cost "of such part thereof as shall be designed primarily for the benefit of the health of the whole city." That the common council is vested with a discretion to determine what part thereof is so designed we think is clear. It has exercised that discretion in this instance, and its action (in the absence of fraud or bad faith) cannot be reviewed. *Putnam v. City of Grand Rapids*, 58 Mich. 416 (25 N. W. 330).

And in determining the district benefited by the public improvement and making the assessment thereon it will be presumed to have acted in good faith where mistake or abuse of discretion is not manifest or demonstrable. *Powers* v. *City of Grand Rapids*, 98 Mich. 393 (57 N. W. 250). See, also, *Davies* v. *City of Saginaw*, 87 Mich. 439 (49 N. W. 667); *Roberts* v. *City of Sandusky*, 158 Mich. 521 (123 N. W. 39).

The next question requiring attention is that growing out of the dealings of defendant with the General Motors Company with reference to the sewer in question. It appears that a committee of the common council negotiated with the general manager of said company for a right of way across its lands on the line of Leith street, extended. On July 16, 1912, they reported an arrangement by the terms of which the General Motors Company was to contribute $500 to the cost of construction, and give a deed to the city of a 10-foot right of way, in consideration of which the company was to be exempted from paying any tax to be levied for said construction. On the same day the common council by resolution adopted the report and instructed its sewer committee to secure the deed for the right of way and the $500 from the General Motors Company. On August 5, 1912, a resolution was adopted providing for the construction of the sewer at an estimated cost of $23,356, providing for the creation of a special assessment district and the appointment of commissioners to make the assessment which was fixed at 75 per cent. for the district and 25 per cent. upon the city at large. The mayor and city clerk were likewise by resolution authorized to enter into the contract for the construction with one William Finlay. On August 17th a resolution was adopted rescinding the action taken on August 5th, and on August 19th a new resolution was passed in effect the same as that of August 5th, except that

the estimated cost, "including the right of way across the lands of the General Motors Company, was fixed at $25,386. We gather from the record that a new arrangement had been made with the General Motors Company by the terms of which it was to be paid the sum of $2,000 for the right of way, and a portion of its real estate was included in the special assessment district.

While the special assessment district is not shown upon any map returned with the record, the evidence shows that no portion of the holdings of the General Motors Company lying south of Leith street extended and contiguous to the proposed sewer was included. Upon this subject the learned circuit judge said:

"I take up next the alleged agreement with the General Motors Company. Although not necessary to consider this branch of the case in order to dispose of it, I think it wise to do so because if, as I suppose, the case finds its way to the appellate court, it will be wise to settle this point also. So, for the purpose of this record, I hold that the agreement not to collect but $500 from the General Motors Company plus a right of way existed originally; that later $2,000 or more was added to the estimated cost of the sewer and $2,000 or more was technically allowed for the right of way crossing the company's ground opened apparently as part of Leith street. I find the right of way is not in fact worth $2,000, but only a nominal sum when the sewer is completed; that the General Motors Company does in fact receive a benefit because it will relieve the surface water accumulating at times at the 30-inch sewer; in fact, if I understand the proofs, it is proposed to connect the 30-inch sewer with the 54-inch one. It amounts to a subterfuge by which the city shall carry out its former agreement to charge the company but $500. It would appear the General Motors Company refused to pay more than the $500 plus the right of way. Now, it may be true that the Buick and the General Motors Company, its successor and its plants, have so benefited the city of Flint that it can well and profitably be exempted from its share

176 MICH.—18.

of the cost of this improvement. I express no opinion upon that. But, when its legal share is transferred to these complainants and to the other persons assessed, it renders the assessment roll illegal. The injunction would also be granted for this reason, if necessary."

The amended special assessment district contained some portion of the lands of the General Motors Company upon which the commissioners appointed by the council assessed the sum of $3,600. This sum will apparently be decreased by $2,000, the amount allowed for the right of way, in the second resolution, although the record does not disclose any contract between the defendant and the company excepting the one exempting it from taxation in consideration of the right of way and $500. Defendant undoubtedly has power to purchase and hold real estate for its proper municipal needs. This power is not only implied or inherent, but is specifically granted in its charter (section 2, chap. 1, Act No. 346, Local Acts 1901). We are, however, disposed to agree with the conclusion of the learned circuit judge that defendant's acts in the premises are open to grave criticism. It is clear that the situation which compels the construction of this large sewer for stormwater only was created in part (perhaps very largely) by the act of the General Motors Company or its predecessor in title in filling in the natural waterway and failing to provide an adequate sewer under its property to take the place of the interrupted ancient watercourse.

The circuit judge found, though upon meager testimony, that the value of the proposed right of way is much less than the $2,000 proposed to be paid therefor. With such light as the record affords we are disposed to agree with him. The defendant should proceed in a proper and legal manner to acquire the right of way at its true value, and all lands of the General Motors Company which will be especially benefited

by the improvement should be included in the special assessment district and made to bear a proportional share of the burden. While no fraud is shown on the part of the council in determining that the private owners of property in the special assessment district should bear 75 per cent. of the cost, it is significant that the commissioners appointed by that body to make the assessment recommended that 50 per cent. only be so apportioned, the balance to be paid out of the general fund. Acting in good faith and without fraud, the final determination of the common council upon this question is controlling upon complainants, and may not be reviewed.

The decree is affirmed, with costs.

STEERE, C. J., and MOORE, McALVAY, KUHN, STONE, OSTRANDER, and BIRD, JJ., concurred.